**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **MARK KNARR,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | )   **No. 4:20-CV-592 PLC** |
| | ) |
| **KILOLO KIJAKAZI,**[1] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant** | ) |

**MEMORANDUM AND ORDER**

Plaintiff Mark Knarr seeks review of the decision of Defendant Acting Social Security Commissioner Kilolo Kijakazi denying his application for Disability Insurance Benefits (DIB) under the Social Security Act.  For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

**I.     Background**

In September 2016, Plaintiff, who was born in May 1970, filed an application for DIB alleging he was disabled as of March 15, 2016[2] as a result of:  schizoaffective disorder, major depression, generalized anxiety disorder, post-traumatic stress disorder (PTSD), degenerative disc disease in lumbar spine, sleep apnea, and diverticulitis.  (Tr. 69, 155-56).  The Social Security Administration (SSA) denied Plaintiff's claims in April 2017, and he filed a timely request for a hearing before an administrative law judge (ALJ).  (Tr. 85-91, 94-95)

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

[2] Plaintiff later amended the alleged onset date of disability to November 14, 2017.  (Tr. 206)

The SSA granted Plaintiff's request for review and conducted a hearing in October 2018. (Tr. 33-67)  In a decision dated February 12, 2019, the ALJ determined that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from June 1, 2016, the alleged onset date, through June 30, 2018, the date last insured (20 CFR 404.1520(g))."  (Tr. 10-20)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-6, 150-152)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Evidence Before the ALJ[3]

Plaintiff testified that he was forty-eight years old, had a high school education, and lived with his fourteen-year-old son, his wife, and her parents.  (Tr. 42-43)  During his school years, Plaintiff took special education classes.  (Tr. 51)  Plaintiff's previous work experience included driving a "fork truck" in a warehouse, delivering medical equipment, and packaging paint.  (Tr. 58-60)

Plaintiff stated that his mental health condition prevented him from working.  (Tr. 43-44) He explained:

> I have a hard time with people in general, with male figures of authority.  I get stressed.  I have a hard time communicating.  I just feel awkward like I'm not, like, smart enough to be around normal people, like not knowing how to carry on a conversation.  So I just try to avoid it.

(Tr. 44)  In regard to his difficulty with male authority figures, Plaintiff elaborated: "[T]hey try to take advantage of me and boss me around, and due to my past, it triggers me to get really aggressive…. I just start screaming…."  (Id.)  Additionally, Plaintiff testified that he had PTSD,

---

[3] As Plaintiff does not challenge the ALJ's findings relating to his alleged physical impairments, the Court  limits its discussion to evidence of Plaintiff's mental impairments.

which could be "trigger[ed] … by a variety of different things," including "[t]he way people talk to" him, and caused him to "get real defensive and loud and aggressive." (Tr. 44-45)

Plaintiff testified that most of his jobs were "pretty short-term" due to his "stress level get[ting] out of control and my anger issues with other employees." (Tr. 47-48) Plaintiff had been fired three or four times due to "[a]cting out, yelling, screaming" at work. (Tr. 47) For example, at his most recent job, he and his boss "got into a verbal argument and I basically just told him to go eff [sic] himself and left." (Id.)

Plaintiff had been receiving mental health treatment from psychiatrist Dr. Yanamadala for "over ten years." (Tr. 52) Plaintiff testified that his medications caused him to feel "drowsy and tired." (Tr. 46) He took most of his medications in the morning and at bedtime, except for Xanax, which he took about three times per day. (Id.) He believed his condition had "been getting worse lately," because he was experiencing "recurring nightmares for the last months." (Tr. 52)

On a typical day, Plaintiff "[j]ust watch[ed] TV." (Tr. 47) Plaintiff attended church services about three times per month with his wife, and he drove his father-in-law to the grocery store "[b]ecause we live with them and he pays for it and … my mother-in-law can't drive[.]" (Tr. 45) Plaintiff ate meals alone, except on "major holidays," and he did not participate in his son's school functions or parent/teacher conferences because he did not want to "make his [son's] school harder than it already is for him." (Tr. 49-50) Plaintiff had no friends, did not socialize, and had not spoken to his siblings in four to five years. (Tr. 48) He did not enjoy reading because he had "a hard time figuring out what it means." (Tr. 51) Plaintiff's wife managed their money and completed job applications for him. (Tr. 51)

Plaintiff's wife Deidre Knarr testified that Plaintiff was diagnosed with "bipolar, post-traumatic stress disorder from emotional, physical and sexual abuse at the hands of his step-father,

3

… major depressive disorder, anxiety disorder, nightmare disorder." (Tr. 55)   In recent years, Plaintiff's conditions caused him to experience "outbursts of anger which he expresses through violence towards inanimate objects.  He'll throw things that break.  He'll punch walls.  He'll break doors down.  He'll kick things.  He curses.  He screams." (Id.) Ms. Knarr confirmed that Plaintiff had been "fired many times," generally after "a physical outburst and then he just leaves or he is told to leave the job." (Tr. 57)  Describing her life with Plaintiff, Ms. Knarr explained:

> I feel as if I am [Plaintiff's] brain most of the time.  I interpret words for him.  I have to read for him and interpret what the meaning is.  I have to spell words for him.  In the past, I have had to fill out all the applications.  I have to type up all the resumes.  To this day, I still have to remind [Plaintiff] to take his medicine.  I have to remind [him] to brush his teeth.  I even had to fix his hair today…..

(Tr. 57)  She believed that, if she were not in Plaintiff's life, he would be homeless.  (Id.)

Finally, a vocational expert testified.  (Tr. 61-66)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience with no exertional limitations but whose "work is limited to simple, routine, and repetitive tasks" with "no interaction with the public, and only occasional interaction with coworkers and supervisors, with no tandem tasks." (Tr. 63-64)  The vocational expert testified that such person could perform Plaintiff's past relevant work as a "packager, machine,"  as well as the jobs of dishwasher, industrial cleaner, and night janitor.  (Tr. 64)

When the ALJ further limited the hypothetical individual to "a low stress job, defined as having only occasional changes in the work setting," the vocational expert stated that the individual would be able to perform the jobs previously identified.  (Tr. 65)  However, if the hypothetical individual "would get into verbal altercations with supervisors during the workday," he would not be able to maintain competitive employment.  (Id.)  Additionally, being "off task

4

15 percent of the time or more" or "consistently missing more than one day of work per month"
would preclude competitive employment.  (Tr. 65-66)

In regard to Plaintiff's medical records, the Court adopts the facts set forth in his statement
of material facts, as admitted by the Commissioner.  [ECF Nos, 20, 25-1]

## III.     Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant
to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).
The Act defines disability as "the inability to do any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period not less than 12 months."
20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the
claimant] is not only unable to do his previous work but cannot, considering his age, education,
and work experience, engage in any other kind of substantial gainful work which exists in the
national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step
evaluation process.  See 20 C.F.R. § 404.1520(a).  Those steps require a claimant to first show
that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must
establish that she has a "severe impairment," defined as "any impairment or combination
of impairments which significantly limits [claimant's] physical or mental ability to do basic work
activities." 20 C.F.R. § 404.152(c).  "The sequential evaluation process may be terminated at
step two only when the claimant's impairment or combination of impairments would have no
more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th
Cir. 2007) (quotation omitted).  At step three, the ALJ considers whether the Plaintiff's

impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1.  Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. § 404.1520(f); McCoy, 648 F.3d at 611.  If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  20 C.F.R § 404.1520(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then she will be found to be disabled.  20 C.F.R. § 404.1520(g).

## IV.    ALJ's Decision

In his decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520. (Tr. 10-20)  First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from his amended alleged onset date of June 1, 2016 through June 30, 2018, his date last insured. (Tr. 12)  At step two, the ALJ found that Plaintiff had the severe impairments of attention deficit hyperactivity disorder (ADHD), PTSD, major depressive disorder, and generalized anxiety disorder, and the non-severe impairment of obesity.  (Id.)  At step three, the ALJ determined that

Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13)

Based on his review of the record, the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but the relevant medical evidence did not support the severity and extent of the symptoms and limitations that Plaintiff alleged.  (Tr. 15-16)  The ALJ determined Plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> [T]he claimant's work is limited to simple, routine and repetitive tasks.  He should work in a low stress job, defined as having only occasional changes in the work setting.  He should have no interaction with the public.  He should have only occasional interaction with co-workers and supervisors, with no tandem tasks.

(Tr. 14)

In making the RFC determination, the ALJ assigned little weight to the opinion of Plaintiff's treating psychiatrist Dr. Yanamadala, finding that it was "strikingly inconsistent with the objective medical evidence, including the numerous mental status examinations mentioned above, and the claimant's own reported activities of daily living[.]"  (Tr. 18)  The ALJ also gave "some weight" to the opinion of state agency psychological consultant Dr. Scher, who opined that Plaintiff was mildly or moderately limited in all areas of work-related mental functioning.  (Id.)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as dishwasher, industrial cleaner, and night janitor.  (Tr. 19-20).  The ALJ therefore concluded that Plaintiff was "not under a disability, as defined in the

Social Security Act, at any time from June 1, 2016, the alleged onset date, through June 30, 2018, the date last insured[.]"  (Tr. 20)

**V.    Discussion**

Plaintiff claims the ALJ erred in determining his RFC because the ALJ failed to properly evaluate the:  (1) medical opinion of Plaintiff's treating psychiatrist; and (2) credibility of Plaintiff's subjective complaints.  [ECF No. 19]  In response, the Commissioner asserts that substantial evidence supported the ALJ's evaluation of the medical opinions and Plaintiff's subjective allegations.  [ECF No. 25]

A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence."  Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Treating Psychiatrist's Opinion

Plaintiff claims the ALJ erred in discounting the opinion of Dr. Yanamadala, Plaintiff's treating psychiatrist of ten years and, in doing so, failed to set forth "good reasons" and substantial evidence to support his reasoning.  [ECF No. 19]  The Commissioner counters that the ALJ properly weighed the opinion evidence and provided "good reasons" for  assigning Dr. Yanamadala's opinion "little weight."  [ECF No. 25]

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Moore, 572 F.3d at 523 (quotation omitted).

"Under the relevant regulations,[4] an ALJ must give a treating physician's opinion controlling weight if it is well-supported by medical evidence and not inconsistent with the substantial evidence in the record."  Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020).  If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight:  length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization.  Id.; 20 C.F.R. § 404.1527(c).

---

[4] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency.  20 C.F.R. § 404.1520c.  As Plaintiff filed his application in September 2016, the previous regulations apply.

Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).  SSA guidance provides that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers … the reasons [for the decision]."  Lucus, 960 F.3d at 1068 (alterations in original) (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

The earliest treatment notes in the record from Dr. Yanamadala are dated April 2015. (Tr. 303)  In April, June, October, and November 2015, Dr. Yanamadala stated that Plaintiff experienced "issues with irritability, anger, poor impulse control," "depressive symptoms," and "panic attacks."  (Tr. 303, 305, 307 309)  He diagnosed Plaintiff with "ADHD, predominantly inattentive presentation" and "major depressive disorder, recurrent, severe."  (Tr. 313)  During that time period, Plaintiff's mental status examinations consistently revealed an "anxious, low" mood.  (Id.)  Plaintiff was taking olanzapine, alprazolam, Pristiq, and Vyvanse.  (Id.)

Dr. Yanamadala's mental status examination of Plaintiff in February 2016 was unremarkable.  (Tr. 312)  However, in May 2016, approximately six weeks before Plaintiff's alleged onset date, Dr. Yanamadala observed that Plaintiff's mood was "anxious, low," prescribed Ambien, and continued Plaintiff's other medications.  (Tr. 315-16)  At two appointments in July 2016, Plaintiff's mood continued to be "anxious, low," but his mental status examinations were otherwise unremarkable.  (Tr. 319, 321)

In January 2017, Dr. Yanamadala completed a psychiatric evaluation for Plaintiff.  (Tr. 383-84).  Dr. Yamanadala noted that Plaintiff's father "was murdered when [Plaintiff] was a

baby" and Plaintiff's stepfather sexually abused Plaintiff for six years.  (Tr. 384)  Although

Plaintiff reported "doing good," Dr. Yamadala recorded the following:

> careless mistakes, difficulty sustaining attention, appears not to listen, poor
> follow through on instructions, difficulty organizing tasks, avoids sustained
> mental effort, loses necessary items, easily distracted, forgetful; fidgets, leaves
> seat when expected to sit, excessively active in inappropriate situations,
> difficulty engaging quietly, appears driven by a motor, talks excessively; blurts
> answers, can't wait turn, interrupts/intrudes.

(Tr. 383)

Additionally, Plaintiff experienced "frequent flashbacks of the traumatic event" and

"feelings of anxiety, occasional panic and intense feelings of fear and sadness."  (Id.)  Dr.

Yamadala wrote:

> [Plaintiff] is not aware of his own explosive responses to trivial social
> interactions.  His flashbacks have contributed to his anger and fighting
> behaviors.  He has experienced intense fear, helplessness, and horror that he
> frequently expresses through disorganized or agitated behavior.  He has
> endorsed dreaming about the event.  He occasionally acts and feels as if the
> traumatic event was recurring.  He experiences intense psychological distress at
> exposure to internal or external cues that symbolize or resemble any aspect of
> his traumatic event…. He experiences extreme arousal such as difficulty falling
> and staying asleep, difficulty concentrating, and hypervigilance.

(Id.)  Plaintiff reported feeling depressed, empty, fatigued, and sad "on a daily basis" for over two

weeks, and his family "confirms patient is tearful."  (Id.)   Plaintiff had difficulty controlling his

anxiety, and "feels restless and keyed up or on the edge, feels tired, difficulty with concentration,

irritable, muscle tension…."  (Id.)

Finally, Plaintiff described "discrete periods of intense fear or discomfort," which "begin[]

abruptly and peak[] within 10 minutes."  (Id.)  These episodes presented with palpitations, chest

pain, diaphoresis, "a sensation of internal and external trembling and shaking," "dyspnea or

choking," and/or nausea.  (Id.)  Plaintiff experienced "an extreme fear of dying during these

attacks."  (Id.)

On examination the same day, Dr. Yanamadala noted that  that Plaintiff "looked apathetic and somewhat anxious," his speech was "slow and hesitant with low tone," "some articulation difficulties," "somewhat delayed reaction time to most questions," and a "lack[ of] spontaneity." (Tr. 384)  Plaintiff's mood was "worried and sad," and his affect was "constricted with difficulty in initiating and sustaining an emotional response to the line of questioning."  (Id.)  In regard to thought content, Dr. Yanamadala observed:  "Emotional expression was somewhat inappropriate to the thought content, as it appeared to have casual attitude to the content of the interview."  (Id.) Plaintiff's concentration, memory, intelligence, judgment, and insight were normal.  (Id.)  Dr. Yanamadala diagnosed Plaintiff with ADHD, PTSD, and "major depressive disorder recurrent severe without psychotic features," and he continued Plaintiff's medications.  (Tr. 385)

When Plaintiff returned to Dr. Yanamadala's office for medication management in February 2017, he reported "good response to medication" and manageable anxiety and depression, with improvement in energy, anhedonia, and concentration.  (Tr. 381)  Plaintiff's mental status examination was unremarkable.  (Tr. 381-82)  Dr. Yanamadala diagnosed Plaintiff with ADHD, PTSD, major depressive disorder, and bipolar disorder, and he prescribed Zyprexa, Pristiq, and Adderall.  (Tr. 382)

In March 2017, Tracey McCarthy, Psy.D., performed a consultative psychological evaluation of Plaintiff.  (Tr. 388-91)  Plaintiff informed Dr. McCarthy that, until Plaintiff was ten years old, his stepfather mentally, physical, and sexually abused him.  (Tr. 388)  Plaintiff experienced symptoms of depression "seven days per week," which caused him to "feel sad and like a loser."  (Tr. 389)  Plaintiff believed his "resistance to handling stress is getting worse," and stated that he had lost "interest and pleasure in life activities."  (Id.)  In regard to his daily functioning, Plaintiff stated he "just can't get motivated.  Most of the day I stay in bed."  (Tr. 390)

He rarely drove, occasionally attended church, and did not pay bills, cook, perform household chores, grocery shop, ride the bus, read, dine out, or socialize.  (Tr. 390-91)

On examination, Dr. McCarthy observed that Plaintiff's facial expression was dull, eye contact was adequate, affect was flat, and speech was slow, low in tone, and "not spontaneous." (Tr. 390)  Plaintiff exhibited "a minor deficit in short-term memory," and his "judgment and insight were noted as variable."  (Id.)  Dr. McCarthy diagnosed Plaintiff with PTSD and major depressive disorder, recurrent episode, unspecified.  In regard to functional limitations, Dr. McCarthy opined:

> ….[Plaintiff's] persistence and pace were challenged.  [Plaintiff's] concentration was generally adequate, with a minor deficit noted in short-term auditory memory.  Based upon [Plaintiff's] performance during the mental status examination, [Plaintiff] evidenced some limitations related to emotional regulation.  No challenges related to behavior control were noted during this examination.  [Plaintiff] will likely benefit from continued intervention for his symptoms.

(Tr. 391)

Later that month, Plaintiff presented to Dr. Yanamadala for medication management and reported "limited improvement in symptoms due to medication," as well as anxiety, anhedonia, and poor appetite, sleep, energy, and concentration.  (Tr. 412)  On examination, Dr. Yanamadala observed that Plaintiff's attitude was "pleasant & cooperative," but his behavior "was extremely anxious.  Patient had difficulty sitting in the office."  (Id.)  Plaintiff's eye contact was "fleeting," speech was "soft and normal," mood was "very anxious," and affect was "anxious."  (Id.)   His thought process, thought content, attention, concentration, memory, intelligence and judgment were normal.  (Tr. 412-13)  Dr. Yanamadala diagnosed Plaintiff with ADHD, PTSD, and "bipolar disorder, current episode depressed, severe, without psychotic features," and he prescribed Pristiq, Adderall, and Effexor.  (Tr. 413-14)

13

In April 2017, state agency psychological consultant Stephen Scher, PhD completed a psychiatric review technique and mental RFC assessment based on Plaintiff's medical records. (Tr. 74-77)  Dr. Scher found that Plaintiff "has severe impairments resulting in some limitations that do not fully preclude all [substantial gainful activity]." (Tr. 75)  Specifically, Dr. Scher opined that Plaintiff was:  mildly limited in the ability to understand, remember, or apply information; moderately limited in the ability to interact with others; moderately limited in the ability to concentrate, persist, or maintain pace; and mildly limited in the ability to adapt or manage oneself. (Tr. 74)  Dr. Scher concluded:  "[Plaintiff] has the ability to focus, remember, and carry out a wide range of work activities.  He has reduced capacity to work collaboratively with others; therefore, he would avoid work involving intense or extensive interpersonal interaction." (Tr. 77)

When Plaintiff saw Dr. Yanamadala later that month, he reported a good response to medication, manageable anxiety, and improved sleep, energy, anhedonia, and concentration.  (Tr. 410)  He was "doing well mood[-]wise," had been helping his son with homework, and was "looking forward to summer." (Id.)  Plaintiff's mental status examination was unremarkable.  (Tr. 410-411)

At Plaintiff's appointment in June 2017, he again reported a "good response" to medication, but Dr. Yanamadala observed that Plaintiff was "extremely anxious" and "had difficulty sitting in the office." (Tr. 408)  Plaintiff's eye contact was "fleeting," speech was "soft and normal," mood was "very anxious," and affect was anxious.  (Id.)  Dr. Yanamadala prescribed Xanax.  (Tr. 409)

In October 2017, Plaintiff reported "limited improvement in symptoms due to medication" and continued to feel anxious and depressed, with anhedonia and poor appetite, sleep, energy, and concentration.  (Tr. 404)  Plaintiff had not taken his medication for two months and experiencing

14

"[i]ssues with poor anger management."  (Id.)  Dr. Yanamadala prescribed Zyprexa and continued Xanax, Adderall, and Effexor.  (Tr. 406-07)

At Plaintiff's medication-management appointment the following month, he reported a good response to medication, manageable anxiety, and improvements in sleeping, energy, concentration, appetite, and anhedonia. (Tr. 401)  On examination, Dr. Yanamadala observed that Plaintiff "[l]ooked apathetic and somewhat anxious without any psychomotor difficulties," "[e]motional expression was somewhat inappropriate to the thought content," and speech was "slow and hesitant with low tone;… some articulation difficulties" and "somewhat delayed reaction time to most questions."   (Tr. 401)  Dr. Yanamadala continued Plaintiff's medications. (Tr. 403)

When Plaintiff presented to Dr. Yanamadala in January 2018, he reported "limited improvement in symptoms due to medication" and he continued to feel anxious, with poor sleep, energy, concentration, and appetite.  (Tr. 397)  Plaintiff was struggling with daytime drowsiness. (Tr. 397)  His mental status examination revealed poor eye contact and anxious behavior, mood, and affect.  (Id.)

In July 2018, approximately two weeks after Plaintiff's date last insured, Plaintiff's condition was "not good," his functioning was "much worse," and he was "[s]truggling with moods." (Tr. 417)  Plaintiff continued to feel anxious and depressed with and poor appetite, sleep, energy, and concentration.  (Id.)  On examination, Dr. Yanamadala again noted poor eye contact, difficulty sitting in the office, and anxious behavior, mood, and affect.  (Tr. 418)  Dr. Yanamadala observed that "Patient is Considered: unstable," and he diagnosed Plaintiff with "major depressive disorder, recurrent severe w/o psych features," panic disorder without agoraphobia, and generalized anxiety disorder.  (Tr. 419)

At his appointment with Dr. Yanamadala in August 2018, Plaintiff stated that he was "okay," his mood was stable, and his depression and anxiety were manageable with current medications. (Tr. 427) However, the following month, Plaintiff reported he was "not doing good," his level of functioning was "worse," and he continued to feel depressed and anxious. (Tr. 431) Plaintiff's eye contact was fleeting and his behavior, mood, and affect were very anxious. (Tr. 432) Dr. Yanamadala assessed Plaintiff's condition as "unstable." (Tr. 433) He prescribed Seroquel and prazosin and continued Plaintiff's alprazolam, olanzapine, and venlafaxine. (Tr. 395)

In early October 2018, Dr. Yanamadala completed a medical source statement (MSS) and mental RFC assessment for Plaintiff (Tr. 393-94) Dr. Yanamadala stated that: Plaintiff had major depressive disorder, panic disorder, generalized anxiety disorder, and ADHD; he was "currently stable on medication"; and he was "unable to work." (Tr. 393)

On a checklist form, Dr. Yanamadala opined that Plaintiff had "extreme" or "marked" limitations in all areas of work-related mental functioning.[5] Specifically, Dr. Yanamalada stated that Plaintiff was extremely limited in the ability to: maintain a work schedule and be punctual; understand and carry out detailed instructions; maintain adequate attention, concentration and focus on work duties; make appropriate simple work-related decisions; stay on task without distractions or need for redirection; work in coordination with or close proximity to others; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to routine changes in work setting; control emotions and deal with routine work-related stressors;

---

[5] The mental RFC assessment form defined an: "extreme" limitation as the "complete inability to perform the activity independently on a sustained basis"; and a "marked" limitation as a "serious limitation," such that the "particular activity could be performed on a satisfactory level only occasionally, no more than 1/3 of the work day." (Tr. 394)

work independently at a competitive pace; and demonstrate reliability in a work setting.  (Id.)  Dr. Yanamadala estimated that, due to psychiatric impairments, Plaintiff would be off task "greater than 15%" of the workday and absent three days per month.  (Id.)

Although the record contains mental health records from as early as April 2015, the ALJ begins his discussion of the medical records with Dr. Yanamadala's treatment notes of March 2017.[6]  After reviewing Dr. Yanamadala's treatment notes and RFC assessment, the ALJ assigned his opinion "little weight," reasoning that his assessments were "strikingly inconsistent with the objective medical evidence, including the numerous mental status examinations noted above, and the claimant's own reported activities of daily living[.]"  (Tr. 18)  The ALJ  gave "no weight" to Dr. Yanamadala's opinion that Plaintiff was unable to work because "[t]he opinion that the claimant is unable to work is … an issue that is reserved for the Commissioner."  (Id.)  In contrast, the ALJ gave "some weight" to non-examining consultant Dr. Scher's opinion that Plaintiff had mild to moderate limitations in all areas of work-related mental functioning, but acknowledged that "evidence submitted after [Dr. Scher's] opinion was rendered support greater mental limitations."  (Id.)

Considering the factors set forth in 20 C.F.R. 404.1527(c), the Court notes that Dr. Yanamadala, a psychiatrist, treated Plaintiff's depression, anxiety, ADHD, and panic disorder for approximately ten years.   The ALJ stated that Dr. Yanamadala's opinion was "strikingly

---

[6] The Court further notes that the ALJ addressed neither Dr. Yanamadala's psychological evaluation of January 2017 nor Dr. McCarthy's consultative examination of March 2017.  The Court recognizes that an ALJ is not required to discuss every piece of evidence in the record.  Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010).  However, the Eighth Circuit has held that remand may be required when a court "cannot determine from the written decision whether the ALJ properly reviewed the evidence."  Willcockson v. Astrue, 540 F.3d 878, 879-80 (8th Cir. 2008).  Furthermore, an ALJ may not "pick and choose only evidence in the record buttressing [his] conclusion" while ignoring contrary evidence.  Taylor v. o/b/o McKinnies v. Barnhart, 333 F.Supp.2d 846, 856 (E.D. Mo. 2004).

17

inconsistent" with his numerous mental status examinations, but he failed to identify or explain the purported inconsistencies. Contrary to the ALJ's conclusory statement that Dr. Yanamadala's opinion was "strikingly inconsistent" with Plaintiff's medical records, Dr. Yanamadala's examinations regularly reflected that Plaintiff's behavior was "extremely anxious," he had difficulty sitting still, his eye contact was fleeting, affect was either "flat" or "anxious," and his mood was either "anxious," "anxious, low," or "very anxious."

Dr. Yanamadala's opinion as to the severity of Plaintiff's symptoms was also consistent with his psychological evaluation of January 2017, which the ALJ did not address in his decision. In that evaluation, Dr. Yanamadala noted that Plaintiff:  appears not to listen; was disorganized/forgetful; had difficulty concentrating; experienced panic attacks that involved palpitations, trembling, shaking, choking, and nausea; and regularly felt depressed, fatigued, guilty, and worthless.  Dr. Yanamadala's treatment notes are consistent with his opinion that Plaintiff was either markedly or extremely limited in all areas of work-related, mental functioning.

The other reason the ALJ provided for discounting Dr. Yanamadala's opinion was its purported inconsistency with Plaintiff's reported activities of daily living.  Although the ALJ did not identify the activities that he believed were inconsistent with the limitations found by Dr. Yanamadala, the ALJ noted earlier in his decision that Plaintiff:  "manages his personal care independently"; "prepare[s] simple meals for himself, although his wife generally does all the cooking, and … he does no housework or yard work"; "is able to drive a car, and go out alone";[7]

---

[7] The Court notes that, while Plaintiff checked a box on the function report stating that he can "go out alone," he also reported:  he went outside "not often at all"; "I don't go shopping"; "I go nowhere … only go to my dr. app[ointments]"; "I use[d] to go out now I just want to be alone." (Tr. 194-95)  At the administrative hearing, Plaintiff testified that he went to church with his wife and to the grocery store with his father-in-law.  Nothing in the record reflects that Plaintiff went places alone.

18

"attends church three times each month, but does not interact with others, rather sits quietly beside his wife"; and "goes shopping with his father-in-law, because his father-in-law pays for it, and his mother-in-law cannot drive." (Tr. 15)  In his function report, testimony, and comments to doctors, Plaintiff stated that he spent most of his days lying in bed and/or watching television.

In the absence of explanation by the ALJ, it is unclear how Plaintiff's limited daily activities are inconsistent with Dr. Yanamadala's assessment that Plaintiff was markedly or extremely limited in all areas of mental functioning and would be off task greater than 15% of the workday and absent from work three days per month.   "'[A]bsent some explanation for finding an inconsistency where none appears to exist,' [the Court] will not fill in the gaps for the ALJ." Lucus, 960 F.3d at 1069 (quoting Reed, 399 F.3d at 921).

Furthermore, Plaintiff's "minimal daily activities, consisting primarily of watching TV, are consistent with chronic mental disability." Pates-Fires v. Astrue, 564 F.3d 935, 947 (8th Cir. 2009) (citing Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir. 2001)).  The Eighth Circuit has repeatedly held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998).  Significantly, in this case, Plaintiff and his wife testified that Plaintiff neither engaged in light housework nor socialized.   "Just as a person with physical impairments need not be bedridden or completely helpless to be found disabled, a person with mental impairments does not have to be hospitalized or suicidal every day to be found disabled." Goolsby v. Berryhill, No. 4:17-CV-2508 NAB, 2019 WL 1326988, at *4 (E.D. Mo. Mar. 25, 2019) (citing Reed, 399 F.3d at 923).  See also Michael v. Kijakazi, No. 4:20-CV-893 MTS, 2022 WL 970885, at *6 (E.D. Mo. Mar. 31, 2022) (evidence that the plaintiff went camping a couple times a year with family, occasionally dined out with her parents, and took her children

to school was not inconsistent with her treating psychiatrist's opinion that she had marked limitation in her ability to complete a normal workweek).

Although not a reason identified by the ALJ, the Commissioner suggests that Dr. Yanamadala's opinion merited little weight because he provided it "four months after Plaintiff's date last insured" and "never indicated that the proposed limitations began prior to June 30, 2018[.]"  [ECF No. 25 at 8]  However, "[e]vidence from outside the insured period can be used in helping elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (internal quotation omitted).  See also Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984) ("medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status").  Given that Dr. Yanamadala treated Plaintiff for over ten years and rendered his opinion a relatively short time after the date last insured, the Court declines to discredit it on this basis.

Based on the above, the Court agrees with Plaintiff's assertion that the ALJ failed to provide "good reasons" for discrediting Dr. Yanamadala's medical opinion.  Dr. Yanamadala was a specialist in the area upon which he rendered his opinion and he treated Plaintiff regularly for approximately ten years.  Additionally, Dr. Yanamadala's opinion was consistent with his own treatment notes and the record as a whole.  Under the regulations applicable to Plaintiff's claim, Dr. Yanamadala's opinion was entitled to more than "little weight."  See 20 C.F.R. § 404.1527(c)(2)(i).  "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." Anderson v. Barnhart, 312 F.Supp.2d 1187, 1194 (E.D. Mo. 2004).  See also Tilley v. Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).

## IV.    Conclusion

Because the ALJ failed to appropriately weigh Dr. Yanamadala's opinion, substantial evidence on the record as a whole does not support the ALJ's determination that Plaintiff was not disabled.  The Court therefore remands this cause to the Commissioner for a proper assessment of Plaintiff's mental functional limitations.[8]

Accordingly,

**IT IS HEREBY ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of August, 2022

---

[8] Because remand is required, the Court does not address Plaintiff's claim that the ALJ failed to properly assess the credibility of his subjective complaints.  See, e.g., Berry v. Kijakazi, No. 4:20-CV-890 RLW, 2021 WL 4459699, at *9 (E.D. Mo. Sep. 29, 2021).

21